Green, J.,
delivered the opinion of the court.
The facts disclosed in this record, raise the question, to what extent gifts for charitable uses can be supported in this State. And in order to a clear conception of the grounds of *361 our judgment, it may not be amiss to state, in the outset, the principles which we consider to be settled by this court, as applicable to this subject.
The argument for the complainants assumes, that this court has held, that the court of chancery in this State, has no jurisdiction for trusts for charitable uses, unless the gift be to a party in esse, capable of sueing for the enforcement of the trust. We do not understand the case of Green vs. Allen, 5 Humph. Rep., 170, to hold this doctrine.
In that case the court maintains, that the court of chancery, in this State can exercise no other jurisdiction than that which was exercised by the Lord Chancellor in England, as an equity Judge, denominated his extraordinary jurisdiction. The common law jurisdiction, the statutory jurisdiction, and the specially delegated jurisdiction, of the Lord Chancellor, do not belong to our Chancellors. This proposition, is also maintained by this court, in the case of Oakley vs. Long, 10 Humph. R., 254. As a necessary consequence of this limitation of the jurisdiction of our court of chancery, it follows, that in all cases, where in England the jurisdiction of the Chancellor is exercised as the delegate of the crown, our court of chancery can afford no relief, but that our court of chancery has jurisdiction, in all cases, where in England, the Lord Chancellor in the exercise of his extraordinary jurisdiction, could have afforded relief.
This proposition is distinctly stated by Turley, Judge, in the case of Green vs. Allen, before referred to. In that case, at page 204, (5 Humph. R.,) after reviewing the state of the law on this subject in England, the Judge says, “If the charity be created either by devise or deed, it must be in favor of a. person having sufficient capacity to take, as devisee or donee, or if it be not to such person, it must be definite in its object, .and lawful in its creation, and to be executed and regulated *362 by trustees, before a court of chancery can, by virtue of its extraordinary jurisdiction, interfere in its execution.”
In the same case, page 206, the court in defining what part of the law of England on this subject is in force in Tennessee, say, “We are, therefore, of opinion, that an attempt by a court of chancery, in this State, to exercise jurisdiction over the subject of charities, beyond what would have been warranted by the extraordinary power of the Chancellor in England, is not justified by any of our statutes creating them, nor by the practice, nor by usage.”
These paragraphs show, that the court in the case of Green vs. Allen, did not intend to restrict the exercise of jurisdiction by our chancery court, except, so far, as the want of “machinery,” for a more enlarged exercise of it, might necessarily have that effect.
Charities have been peculiarly favored by the courts, from the earliest period of the history of our law. Donations of this sort are usually made, for the advancement of education, morality and religion, and for the relief of the indigent, helpless and disabled; objects which must meet with favor in every civilized and Christian community. Hence, devises and gifts to charitable uses, have been sustained, in cases, where, if the trusts had been for other objeets, they would have been void for uncertainty.
In Story’s Eq. Jurisp., § 1187, it is said, “It is clear, upon principle, that the court of chancery, merely in virtue of its general jurisdiction over trusls, independently of the special jurisdiction conferred by the statute of 43d Elizabeth, chap. 4, must in many cases, have a right to enforce the due performance of charitable bequests; for (as has been well observed,) the jurisdiction of courts of equity, with respect to charitable bequests, is derived from the general authority to carry into execution the trusts of a will or other instrum ent, according to the intention expressed in that will or instrument. We shall *363 presently see, that this is strictly true in all cases, where the charity is definite in its objects, is lawful, and is to be executed and regulated by trustees, who are specially appointed for the purpose.” Lord Eldon said, after a full review of the cases, that where there is a general indefinite purpose of charity, not fixing itself upon any particular object, the disposition and administration of it are in the King, by his sign manual. But where the gift is to trustees, with general objects, or with some particular objects pointed out, then the court of chancery will take upon itself the administration of the charity. Story’s Eq. Jur., § 1190; Moggridge vs. Thackwell, 7 Vesey, 36, 75, 85, 86.
And in Story’s Eq. Jurisp., § 1191, it is said, “Where a charity is definite in its objects, and lawful in its creation, and it is to be executed and regulated by trustees, whether they are private individuals or corporations, there the administration properly belongs to such trustees; and the King as parens patrim, has no general authority to regulate or control the administration of the funds. In all such cases, however, if there be any abuse, or misuse of the funds by such trustees, the court of chancery will interpose, at the instance of the Attorney General, or the parties in interest, to correct such abuse, or misuse of the funds. But in such cases, the interposition of the court is properly referable to its general jurisdiction, as a court of equity, to prevent abuses of trust, and not to any original right to direct the management of a charity, or the conduct of the trustees. Indeed, if the trustees of the charity should grossly abuse their trust, a court of equity may go the length of taking it away from them, and commit the administration of the charity to other hands. But this is no more than the court will do, in proper cases, for any gross abuse of other trusts.”
The foregoing quotations may suffice to show, that the settled rule in England, is, that if trustees are interposed to ex *364 ecute and regulate the charity, and the objects are definite, and its creation lawful, the administration of the charity properly belongs to the trustees, and not to the King; and that the court of chancery, in virtue of the extraordinary jurisdiction, will interpose to correct any abuse of the trust. And it will also appear that in the case of Green vs. Allen, Judge Turley distinctly recognises the existence of this jurisdiction in our courts of chancery, to the full extent that it existed in the court of chancery in England, as a court of equity.
But it is argued for the complainants, that as in England nothing can be a charity which is not made such by the statute, 43d Elizabeth, chap., 4, and as that statute is not in force in this State, we cannot determine what gifts are, and what are no.t charities, and that the law of charities existing before that statute, was merged in its provisions, or became obsolete, and that there can be no charity independently of the statute, therefore, there can be no charity in this State, because the statute is not in full force here.
There are several satisfactory answers at hand, to this argument. In the first place, although the statute of 43d Eliz., chap. 4, is not in force here, it is not rendered inoperative by any repealing statute of our own, (as is the case in Virginia,) so that no aid can be derived from its provisions, but to use the language of Judge Turley, in Green vs. Allen, “it is notin 1 orce because we have not the machinery necessary to carry it into execution.” Or in the language of the Supreme Court of Pennsylvania, “It is so considered, rather on account of the inapplicability of its regulations as to the modes of proceeding, than in reference to its conservative provisions.” Witman vs Lex, 17 Serg. & Rawle, 88; Zimmerman vs. Andres, (January term, 1844.)
Lord Rcdesdale, a great Judge in equity said, “We are re-fered to the statute of Elizabeth with respect to. charitable uses, as creating a new law upon the subject of charitable *365 uses. That statute only created a new jurisdiction; iterated n ^ new law.” Attorney General vs. Mayor Dublin, 1 Bligh R., 312, 347.
If the statute of Elizabeth created no new law, but only a new jurisdiction, its conservative provisions having been the law before the enactment of the statute, the consequence is, they became a part of the common law of this State. When, therefore, we disregard the statute as being inoperative here, we do so, only because we have "not the machinery by which it was carried into execution. The regulations in reference to the new jurisdiction created by the statute, were inapplicable here, and hence, those regulations were not in force, but its provisions, that were law before its enactment, continue to be law, not because of the statute, but being unre-pealed, they do not cease to be law because they were embodied in a statute, which we cannot carry into effect, for want of the necessary machinery.
Again, if the provisions of this statute were law before its enactment, and were of equitable cognizance, the creation of a new jurisdiction, could not oust the jurisdiction of the court of chancery, as it existed before the statute, there being no provision in the statute, taking away that jurisdiction. Such new jurisdiction would be concurrent with the jurisdiction of the chancery court.
In suggesting, on the authority of Lord Redesdale, that the provisions of this statute, are law in this State, because they were law before the statute, it is not intended to intimate that the extravagant construction, which has been put upon its provisions in England, is to be regarded as law here; nor is it intended to weaken the case of Green vs. Allen, or to indicate that our courts of chancery can take cognizance of any trust for charitable uses, unless it be of such character as the court of chancery in England, in the exercise of its extraordinary jurisdiction, would have interposed to protect. *366 But the object has been to show, that the law of charities, where a trust is created, for lawful objects, definite in its character, and vested in trustees, so that it is properly cognizable in our own courts of chancery, has continued in existence from the earliest period in the history of our law, and is still in force.
It is said, we will be involved in inextricable difficulties, if we attempt to uphold gifts to charitable uses. That we have no rule to determine what would be a superstitious use, and what a valid charity.
It is certainly true, that gifts which in England are held to be invalid, as being made to superstitious uses, would not be such in this country, but it does not follow that all gifts professing to be for charity would be valid. If the object were illegal or in opposition to the policy of the State, of course the courts would refuse to lead their aid for such object; and it will be no more difficult to determine in such caso, whether the act be against law or public policy, than in many other cases, where the validity of the contract comes into question, as being illegal, or in opposition to public policy.
Having premised thus much, the following propositions may be stated, as being established.
1st. The duties and powers which in England belong to the prerogatives of the crown, in reference to idiots, lunatics and charities, and which are vested in the Lord Chancellor, by the King’s warrant, under his sign manual, do not exist in our chancery courts.
2d. No powers other than those, which in England, were exercised by the Chancellor, by virtue of his extraordinary jurisdiction, exist in our chancery court.
3d. Trusts for charitable uses, are favored by courts of equity, and will be supported in the exercise of the extraordinary jurisdiction of the chancellor in cases, where the trust would fail for uncertainty, were it not a charity.
*367 4th. If the fund be vested in a trustee, to be managed and controlled by him, for a lawful, definite, charitable use, the gift will be valid, though there be no person in being capable of sueing for the enforcement of the trust.
5th. Such provisions of the statute of 43d Elizabeth, chap. 4, as were the law before the enactment of that statute, and which are applicable to our institutions, are in force here, as part of our common law, notwithstanding the statute is not in force.
It remains only to apply these principles to the legacies of this will. The bequest is, of seventy-four hundred dollars to the Treasurer of Clarke and Erskine College, and his successors in office in trust.
1st. Two thousand dollars, for the endowment of the College.
2d. Twenty-two hundred, for the benefit of Home Missions.
3d. Twenty-two hundred dollars, for the benefit of Foreign Missions, and
4th. One thousand dollars, for the education of indigent young men, who are preparing for the gospel ministry, in the Associate Reformed Church.
The sums given for home missions; for foreign missions; and for the education of indigent young men for the ministry; are to be held, and the interest applied to these objects under the direction of the Associate Reformed Synod of the South.
In relation to the gift for the endowment of Clarke and Ers-kine College, no serious objection is interposed by the counsel who have argued the case. And we think this bequest is unquestionably good.
There can bé no doubt as to the institution for the benefit of which this endowment is intended. The words are, “Clarke and Erskine College, situated at due west corner, Abbeville District, South Carolina.”
*368 It has been seen that the institution of learning at that place, was incorporated in 1837, in the name and style of “Clarke and Erskine Seminary.” This institution was established by and has been under the patronage and control of the Associate Reformed Synod of the South, of which church the testator was a member. The institution grew in importance and was organised as a college, and for some years before the date of the will had been called and known, as “Clarke and Erskine College.” Now the testator uses the name by which the institution was familiarly known, and his description of the institution to which the bequest is made, and the fact as shown by the proof, that “Clarke and Erskine College” and “Clarke and Erskine Seminary,” are one and the same, leave no doubt as to the identity of the two in his mind.
The rule is so familiar, and so consonant with reason, that it needs no authority to support it, that where the name or description of a legatee is erroneous, and there is no reasonable doubt as to the person who was intended to be named or described, the mistake will not disappoint the bequest. The true intention of the testator may be ascertained, and the error corrected. 2 Williams on Executors, 736.
This bequest is, therefore, to an incorporated institution of learning for the endowment thereof, and is good and valid as if it had been a gift to a natural person.
As to the other three bequests, there is no doubt of their validity, upon the principles heretofore stated,
In 1849, and before the death of the testator, the Legislature of South Carolina granted a charter of incorporation, providing, “That the Associate Reformed Synod of the South, be and they are hereby authorized to nominate and appoint Doct. E. E. Pressly, Doct. James P. Pressly, Rev. R. C. Grier, James Lindsay, James Fare and Archibald Kennedy, trustees to serve during the pleasure of said Synod, who, with their successors similarly appointed from time to time, are hereby *369 declared to be a body corporate and politic, by the name and style of ‘Trustees for the Associate Reformed Synod of the South,’ to hold and manage property, real, personal or mixed, or choses in action, of the value, at the time of acquisition, of three hundred thousand dollars,in trust for, and subject to the control and direction of said Synod; all or any of said trustees to be removed and others appointed in their place by said Synod at its pleasure.”
We regard this charter, as a virtual incorporation of the “Associate Reformed Synod of the South.” Its terms authorize the said Synod to appoint certain persons trustees, who are incorporated under the name of “Trustees for the Associate Reformed Synod of the South,” and the Synod is empowered to remove any or all said trustees at its pleasure, and to appoint others, and that the funds are to be held in trust for and subject to the control of the Synod. The bequest, therefore, of this charity to the “Associate Reformed Synod of the South,” vests in the trustees, thus incorporated, a right to sue for and recover this fund, to be held by them, as their other funds are held, subject to the control of the Synod.
At any rate, the slight misnomer in the bequest, merely omitting the word “trustees,” could not vitiate the gift, the intention of the testator being clear and unquestionable, but the bequest would be regarded as having been made to the “Trustees of the Associate Reformed Synod of the South.”
But it is objected that the bequests for the benefit of “Home Missions,” and of “Foreign Missions,” are too vague and uncertain, and are therefore void.
It is certainly true that the individuals who may receive any part of this fund as compensation for labor as missionaries, are not designated or known; nor are the persons designated who may be benefitted by the ministry of these missionaries; but if this objection were allowed to prevail, it would defeat all charities, for it is of the very nature of a charity, *370 that the individual beneficiaries of the charity are unknown. The gift for such purpose, is of the nature of a power of appointment, and being controlled and administered by trustees, and the objects definite, it is valid. If a gift were made to trustees, for the benefit of the Protestant Orphan Asylum of Nashville, no one would doubt of its validity, and yet what orphan could claim that he was a beneficiary, until his introduction into the Asylum.
The religious denominations of Christian countries, we know, are engaged by means of funds contributed by their communities, in the propagation of the gospel, among the heathen in foreign countries, and this is termed a “Foreign Mission,” and they are engaged in like manner, in supplying the destitute in their own country with the gospel, and this is termed a “Home Mission.” These terms are as well understood, and have as definite a meaning as any other terms in the language.
The bequests of this will are, therefore, in our opinion, valid, and we so decree.