# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 5, 2005 Session

## TENNESSEE DIVISION OF THE UNITED DAUGHTERS OF THE CONFEDERACY v. VANDERBILT UNIVERSITY

**Appeal from the Chancery Court for Davidson County**
**No. 02-3095-I    Irvin H. Kilcrease, Jr., Chancellor**

_____

**No. M2003-02632-COA-R3-CV - Filed May 3, 2005**

_____

This appeal involves a dispute stemming from a private university's decision to change the name of one of its dormitories. An organization that donated part of the funds used to construct the dormitory filed suit in the Chancery Court for Davidson County asserting that the university's decision to rename the dormitory breached its seventy-year-old agreement with the university and requesting declaratory and injunctive relief and damages. Both the university and the donor filed motions for summary judgment. The trial court, granting the university's motion, determined that the university should be permitted to modify the parties' agreement regarding the dormitory's name because it would be "impractical and unduly burdensome" to require the university to continue to honor the agreement. The donor organization appealed. We have determined that the summary judgment must be reversed because the university has failed to demonstrate that it is entitled to a judgment as a matter of law. Furthermore, based on the essentially undisputed facts, we have determined that the donor is entitled to a partial summary judgment because the university has breached the conditions placed on the donor's gift and, therefore, that the university should be required to return the present value of the gift to the donor if it insists on renaming the dormitory.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM B. CAIN, J., filed a concurring opinion.

Douglas E. Jones and Robert J. Notestine, III, Nashville, Tennessee, for the appellant, the Tennessee Division of the United Daughters of the Confederacy.

William N. Ozier and Leona Marx, Nashville, Tennessee, for the appellee, Vanderbilt University.

**OPINION**

**I.**

In 1867, George Peabody, an American merchant and financier living in London, donated one million dollars to establish a fund for the improvement of education in the South in the aftermath

of the Civil War.[1]  Within a few years, the trustees of the fund, known as the "Peabody Education Fund," had settled on a plan to endow a teacher training school, or normal school, as the best way to achieve the purpose of the fund.  In 1875, the Peabody Education Fund financed the creation of a teacher training school within the existing University of Nashville.[2]  The teacher training school was officially named the "State Normal College," and it operated under the auspices of the Peabody Education Fund board of trust, the University of Nashville board of trust, and the newly created Tennessee State Board of Education.  In 1889, the school was renamed "Peabody Normal College" in honor of the school's benefactor.

In 1902, the trustees of the Peabody Education Fund announced plans to liquidate the fund. Three years later, they voted to direct one million dollars of the proceeds to create a permanent endowment for a college of higher education for teachers in the Southern states as a successor to the Peabody Normal College.  The trustees conditioned the gift on the raising of $550,000 in matching funds from the State of Tennessee, Davidson County, the City of Nashville, and other sources and on the University of Nashville's donation of the land and buildings then being used by the Peabody Normal College.  The trustees stipulated that the new institution would be known as the "George Peabody College for Teachers."[3]

When the final governmental appropriations were made in 1909, the Tennessee General Assembly incorporated the George Peabody College for Teachers ("Peabody College").  The trustees of the new college, who had been appointed by the Peabody Education Fund trustees, quickly voted to spend almost $400,000 to purchase several properties adjacent to Vanderbilt University ("Vanderbilt").[4]  Although the University of Nashville had donated land and buildings for use by the new college, the newly appointed Peabody College trustees had decided, with the support of the Peabody Education Fund trustees, to construct a new campus near Vanderbilt to foster institutional cooperation.

The Peabody College trustees embarked on an ambitious building plan for the new location, taking as their guide the design of the University of Virginia.  Classes continued at the old Peabody

---

[1]Except as otherwise noted, the historical background information in this section of the opinion is drawn from the record on appeal and the following sources:  BILL CAREY, CHANCELLORS, COMMODORES, AND COEDS: A HISTORY OF VANDERBILT UNIVERSITY (2003); PAUL K. CONKIN, PEABODY COLLEGE: FROM A FRONTIER ACADEMY TO THE FRONTIERS OF TEACHING AND KNOWLEDGE (2002); SHERMAN DORN, A BRIEF HISTORY OF PEABODY COLLEGE (1996); PAUL K. CONKIN, GONE WITH THE IVY: A BIOGRAPHY OF VANDERBILT UNIVERSITY (1985); and GEORGE PEABODY COLLEGE FOR TEACHERS, THE SEMICENTENNIAL OF GEORGE PEABODY COLLEGE FOR TEACHERS (1925).

[2]The University of Nashville traced its roots to 1785, eleven years before Tennessee became a state, when the North Carolina Legislature established the "Davidson Academy" in what is now downtown Nashville.  In 1806, the Tennessee General Assembly renamed Davidson Academy "Cumberland College" in order to take advantage of a federal land grant.  In 1826, the Tennessee General Assembly changed the name of the institution again, this time to the "University of Nashville."

[3]Act of Jan. 29, 1909, ch. 20, 1909 Tenn. Acts 42, 42-43.

[4]One of the properties acquired by Peabody College was a portion of the former campus of Roger Williams University, a school for African-Americans that had relocated after two of its buildings burned down in 1905.

Normal College in downtown Nashville through the end of the 1910-11 academic year.[5]  The new campus did not open for students until the summer of 1914, and when it did, only the Industrial Arts Building and Home Economics Building had been completed.

The construction of the Peabody College's campus provided the Tennessee Division of the United Daughters of the Confederacy ("Tennessee U.D.C.") with the perfect opportunity to implement a project it had been contemplating for some time.  Since 1902, the Tennessee U.D.C. had been discussing the idea of raising funds for the construction of a women's dormitory for the use of descendants of Confederate soldiers at a college or university in Tennessee.  Accordingly, following the announcement of Peabody College's decision to move to a new campus, the Tennessee U.D.C. and Peabody College began to discuss underwriting the construction of a dormitory on Peabody College's new campus.

On January 21, 1913, the Tennessee U.D.C. entered into a contract with the Peabody College trustees to raise $50,000 for the construction of a women's dormitory on the new campus.  In return for this gift, the trustees agreed to allow women descendants of Confederate soldiers nominated by the Tennessee U.D.C. to live in the dormitory rent-free and to pay other dormitory expenses on an estimated cost basis.  The contract reserved to the college the right to reject anyone nominated by the Tennessee U.D.C. and stipulated that the college would select the design and plan for the dormitory, would hold title to the building, and would control and manage it.  However, it also stated that the Tennessee U.D.C. was "invited by the Trustees of the George Peabody College for Teachers to maintain throughout the future an advisory relationship with regard to the management of said building."  The 1913 contract specifically stated that the purpose of the Tennessee U.D.C. and Peabody College in entering into the contract was to evidence the agreement by which the Tennessee U.D.C. undertook to raise the construction fund and "the conditions which will be attached to the gift of the said fund" to Peabody College.

The fundraising campaign proceeded slowly at first.  By 1927, fourteen years into the campaign, the Tennessee U.D.C. had collected little more than a third of the $50,000 it had agreed to raise.  The Tennessee U.D.C. desired to turn over these funds to Peabody College but also desired to retain a right to recall them in the event the fundraising campaign ultimately failed.  Thus, on June 17, 1927, the Tennessee U.D.C. entered into a second written contract with Peabody College.

The second contract stated that both parties desired that a "Confederate Memorial Hall" building be constructed on Peabody College's campus.  The Tennessee U.D.C. agreed to pay over to the college treasurer the $17,421.47 it had already raised and to turn over further sums when they were collected.  In return, the college agreed that when the funds reached a sufficient amount, it would construct a building on its property conforming to plans and specifications to be agreed upon by the parties, and that the building would be used for the purposes contemplated by the parties.  In addition, the college agreed to invest the sums deposited by the Tennessee U.D.C., to pay the interest

_____

[5]By all accounts, the Peabody Normal College had succeeded in its mission to train teachers for the improvement of education throughout the South.  Between its opening in 1875 and the closing of the downtown campus in 1911, the Peabody Normal College graduated 2,678 students, 97% of whom reportedly entered teaching.  As one historian has noted, the Peabody Normal College was "the strongest normal school in the South, by far, and among the best in the United States."

earned on these sums into the building fund annually, and to return the sums deposited, with interest, if the Tennessee U.D.C. decided to recall them.

In spite of the Great Depression, during the next six years the Tennessee U.D.C. managed to raise enough money to meet its original $50,000 goal. By that time, the Tennessee U.D.C. and Peabody College had decided that although a small women's dormitory could be constructed for $50,000, they would both prefer to use the $50,000 as partial funding for the construction of a larger women's dormitory to be located on the campus quadrangle. Peabody College estimated that the larger dormitory would cost approximately $150,000 and had already applied to the National Recovery Administration for the extra funding.

Sometime in September of 1933, the Tennessee U.D.C. and Peabody College entered into a third written contract to reflect their new plans.[6] The third contract expressly ratified and affirmed the 1913 and 1927 contracts. The Tennessee U.D.C. agreed to allow the college to use the original $50,000 and any additional sums raised by the Tennessee U.D.C. for the construction of a larger building, the plans and specifications of which had been examined, approved, and signed by representatives of the Tennessee U.D.C.[7] The Tennessee U.D.C. agreed to this modification on the condition that the college allow the first two floors of the larger dormitory to be used for the purposes specified in the 1913 and 1927 contracts, and on the further condition that the college place on the building an inscription naming it "Confederate Memorial." The third contract explicitly stated that it was "the intention of the parties that this contract shall be void and of no effect in case [the additional funding] is not obtained from said National Recovery Administration."

The National Recovery Administration denied the request for a $100,000 construction grant on the ground that Peabody College was not a "public body." Nevertheless, the Peabody College trustees and the Tennessee U.D.C. decided to proceed with their plans to use the Tennessee U.D.C.'s gift as partial funding for the construction of the larger dormitory. On June 8, 1934, the Peabody College trustees voted to borrow $100,000 from the school's permanent endowment to supplement the funds raised by the Tennessee U.D.C. On July 12, 1934, the contract for the construction of the new dormitory was awarded to V. L. Nicholson Co. for a guaranteed price of $131,294 or less. Construction drawings dated July 12, 1934 show the words "Confederate Memorial Hall" in incised lettering on the pediment on the front of the building. The building was completed in less than a year, and on June 1, 1935, Peabody College held a dedication ceremony for the new dormitory at which members of the Tennessee U.D.C. spoke.

From 1935 until the late 1970's, women descendants of Confederate soldiers nominated by the Tennessee U.D.C. and accepted by Peabody College lived in Confederate Memorial Hall rent-

---

[6]From the face of the 1933 contract, it appears that the wife of the president of Peabody College was at that time serving on the Tennessee U.D.C.'s Confederate Memorial Hall Committee.

[7]The record on appeal does not contain the plans and specifications signed by representatives of the Tennessee U.D.C. that are referred to in the 1933 contract.

free.[8] However, by the late 1970's, Peabody College found itself in increasingly dire financial straits. In the spring of 1978, the trustees of the college decided to lease two dormitories, including Confederate Memorial Hall, to Vanderbilt as a way to raise revenue. By that time, only a few students nominated by the Tennessee U.D.C. were living in Confederate Memorial Hall, but Confederate Memorial Hall still housed various artifacts placed there by the Tennessee U.D.C., including Confederate portraits, furniture, and scrapbooks.

When the Tennessee U.D.C. learned of the college's decision to lease Confederate Memorial Hall to Vanderbilt, Mary Sneed Jones, head of the Tennessee U.D.C.'s Confederate Memorial Hall Committee, wrote a letter to Peabody College President John Dunworth urging that a different dormitory be leased to Vanderbilt. Ms. Jones inquired about the college's plans for future "room awards" to women descendants of Confederate soldiers in the event the dormitory was leased to Vanderbilt and expressed concern for the Confederate artifacts placed in the building by the Tennessee U.D.C. In spite of these concerns, Peabody College proceeded with its plan to lease the dormitory to Vanderbilt. The record on appeal does not contain Peabody College's response to the Tennessee U.D.C.'s concerns regarding future "room awards," but it does contain the college's response regarding the disposition of the Confederate artifacts. On May 15, 1978, Ms. Jones and President Dunworth entered into a letter agreement in which the college agreed to return the Confederate artifacts to the Tennessee U.D.C. with the understanding that the Tennessee U.D.C. would then donate them to the Tennessee State Museum and the Tennessee State Library and Archives for future preservation.

Peabody College's financial situation continued to deteriorate, and it soon became evident that the college would either have to merge with another institution or face bankruptcy. In the fall of 1978, the executive committee of the college's board of trust voted to allow President Dunworth to enter into confidential merger discussions with Vanderbilt. Vanderbilt was interested in absorbing the college's assets but would not agree to preserve the college as a distinct school within Vanderbilt. As a result, President Dunworth suspended negotiations with Vanderbilt in December 1978 and entered into talks with George Washington University, Duke University, and Tennessee State University.

Tennessee State University emerged as the leading candidate for the merger.[9] Tennessee State University would benefit from the additional resources and prestige of Peabody College, as well as the opportunity to offer doctoral programs in education, while Peabody College would be allowed to continue as a college of education and to retain most of its current faculty. The merger discussions with Tennessee State University became public in mid-February of 1979. Faced with competition from Tennessee State University and the possibility of losing its joint programs and other arrangements with Peabody College, Vanderbilt moved quickly to reopen merger talks with

---

[8]It is unclear from the record on appeal how many students nominated by the Tennessee U.D.C. lived in Confederate Memorial Hall over the years.

[9]At the time, Tennessee State University, a historically black public university, was in the process of merging with the predominantly white University of Tennessee at Nashville as a result of a federal desegregation court order. *See Geier v. Blanton*, 427 F. Supp. 644, 661 (M.D. Tenn. 1977), *aff'd sub nom. Geier v. Univ. of Tenn.*, 597 F.2d 1056 (6th Cir. 1979).

President Dunworth. Vanderbilt offered substantially better terms than it had the previous December. Among other things, Vanderbilt agreed to allow Peabody College to continue to operate as a separate college of education and human development within Vanderbilt following the merger. On April 28, 1979, the trustees of Vanderbilt and Peabody College entered into an agreement effectuating the merger. Under the terms of the merger agreement, Vanderbilt succeeded to all of Peabody's legal obligations.

By the time of the merger, only four students nominated by the Tennessee U.D.C. were still living in Confederate Memorial Hall. Vanderbilt allowed these four students to continue living there at a reduced rental rate, but after they graduated, no other students nominated by the Tennessee U.D.C. were allowed to live in Confederate Memorial Hall rent-free or at a reduced rate.[10]

In 1987 and 1988, Vanderbilt spent approximately $2.5 million to renovate and upgrade Confederate Memorial Hall. During the following academic year, there was much discussion on the Vanderbilt campus regarding the propriety of retaining the name "Confederate Memorial Hall." A well publicized forum to discuss the issue was attended by Vanderbilt faculty, students, and staff, as well as representatives of the Tennessee U.D.C. and concerned citizens. Vanderbilt Chancellor Joe B. Wyatt later issued a statement announcing that he was not inclined to recommend renaming Confederate Memorial Hall based on the historical information currently available and because of "the absence of any indication that the naming of Confederate Memorial Hall by George Peabody College for Teachers was in any sense intended to support either slavery or any other form of prejudice toward Blacks."

Within a few months, the Vanderbilt Student Government Association passed a resolution recommending that Vanderbilt install a plaque on Confederate Memorial Hall explaining why it was named "Confederate." Vanderbilt officials, in consultation with representatives of student groups and the Tennessee U.D.C., agreed to place a plaque by the entrance to Confederate Memorial Hall explaining the contributions of the Tennessee U.D.C. and the resulting name of the building. The plaque was installed in 1989.[11]

Controversy over the name of Confederate Memorial Hall arose again in the spring of 2000 when the Vanderbilt Student Government Association passed a resolution calling on the

---

[10]Vanderbilt has continued to use the building as a dormitory to the present day.

[11]The record on appeal does not contain a photograph of the plaque or a description of its wording as installed. However, the record contains a draft version of the plaque reflecting that it contains the following inscription:

**CONFEDERATE MEMORIAL HALL**
CONSTRUCTED IN 1935 BY GEORGE PEABODY COLLEGE FOR TEACHERS,
IN PART, WITH FUNDS RAISED AT PERSONAL SACRIFICE DURING THE GREAT DEPRESSION,
BY TENNESSEE WOMEN OF THE UNITED DAUGHTERS OF THE CONFEDERACY,
IN MEMORY OF THEIR FATHERS AND BROTHERS
WHO FOUGHT IN THE WAR BETWEEN NORTH AND SOUTH, 1861-65.
DEDICATED TO THE EDUCATION OF TEACHERS FOR A REGION SORELY IN NEED OF THEM.
RENOVATED BY VANDERBILT UNIVERSITY IN 1988,
FOR CONTINUED SERVICE TO ALL ITS STUDENTS.
1989

administration to change the name of the building. The resolution stated that students, faculty, staff, and members of the administration had expressed great discontent with the name, that the name did not honor the heritage of all Vanderbilt students, faculty, and administrators, and that regardless of the original intent of the Tennessee U.D.C. in 1935, individuals at Vanderbilt felt offended by the name. The resolution noted that the demographic population of Vanderbilt had changed significantly since 1935[12] and that Vanderbilt respected all individuals regardless of their racial identity.

E. Gordon Gee became the new chancellor of Vanderbilt in July 2000. In conversations with Vanderbilt students, faculty, and alumni over the next two years, the name of Confederate Memorial Hall was repeatedly identified as a major impediment to the progress of the university. In June 2002, Chancellor Gee discussed the matter with the executive committee of the Vanderbilt board of trust, and the executive committee decided that Chancellor Gee would handle the issue as an administrative matter. Chancellor Gee, without consulting the Tennessee U.D.C., then decided to change the name of "Confederate Memorial Hall" to "Memorial Hall," and his decision was made public in the fall of 2002.

Chancellor Gee's decision to rename Confederate Memorial Hall generated substantial public discussion. In September 2002, after the decision to rename the building was made public, Vanderbilt's vice chancellor for public affairs wrote to the Tennessee U.D.C. to explain Chancellor Gee's decision. The letter expressed gratitude to the Tennessee U.D.C. for its assistance to Peabody College in educating young teachers during a difficult time in the nation's history and stated that the decision to rename the building had been made only after careful deliberation by the Vanderbilt administration, students, and faculty. In addition, the letter promised that the historic marker indicating the origins and historical significance of the building and the contributions of the Tennessee U.D.C. would remain in its current location. On October 3, 2002, Chancellor Gee met personally with representatives of the Tennessee U.D.C. and confirmed Vanderbilt's intention to rename Confederate Memorial Hall. Chancellor Gee also confirmed that the plaque by the entrance explaining the history of the building would remain in place.

On October 9, 2002, the Vanderbilt Student Government Association passed a resolution endorsing Chancellor Gee's decision to rename Confederate Memorial Hall. The resolution stated that the name of Confederate Memorial Hall had been under debate for fourteen years because of its negative association with slavery, that members of the Vanderbilt community had resolved not to live in Confederate Memorial Hall because of its name, and that Vanderbilt should strive to be a place where all students are challenged but not excluded from feeling a part of their campus and their dormitories. The resolution noted that names on buildings are usually a sign of pride for and thankfulness to the contributions made to construct them, but that Vanderbilt was not proud of the legacy of slavery attached to the name of Confederate Memorial Hall or some of the actions of the United Daughters of the Confederacy.

---

[12]Vanderbilt did not admit African-American students to its graduate programs until 1953, and the first African-American undergraduates were not enrolled until 1964, the same year that Peabody admitted its first African-American undergraduate students. By the 2002-03 academic year, there were 371 African-American students in the Vanderbilt undergraduate student body.

On October 10, 2002, Chancellor Gee drafted a memorandum to the full Vanderbilt board of trust explaining his decision to rename the building. Chancellor Gee stated that former, current, and prospective students, faculty, and staff had identified the presence on the Vanderbilt campus of a building named "Confederate Memorial Hall" as a barrier to achieving an inclusive and welcoming environment that is essential for a world-class university. He also noted that some individuals had refused to live or attend events in the building; that the building was originally named "Confederate Memorial Hall" to commemorate values that do not reflect those of a university dedicated to educating all and meeting the aspirations of the broader society; and that assigning students to live in a dormitory so named implied an endorsement, if not a celebration, of a system that many people find offensive. Finally, Chancellor Gee observed that having a building on the campus named "Confederate Memorial Hall" strongly reinforced the worst stereotypes held by many people that Vanderbilt is an institution trapped in a long-distant past.

The Vanderbilt board of trust supported Chancellor Gee's decision to rename Confederate Memorial Hall. Since then, Vanderbilt has changed its maps, website, and correspondence to reflect the building's new name of "Memorial Hall." Vanderbilt has not yet removed the name "Confederate Memorial Hall" from the pediment on the front of the building but has indicated its unequivocal intention to do so. The 1989 plaque describing the history of the building and the contributions of the Tennessee U.D.C. remains in place by the entrance of the building.

On October 17, 2002, the Tennessee U.D.C. filed suit against Vanderbilt for breach of contract in the Chancery Court for Davidson County. The Tennessee U.D.C. alleged that it had fully performed its obligations under the 1913, 1927, and 1933 contracts and that Vanderbilt's renaming of Confederate Memorial Hall constituted a breach of those contracts. The Tennessee U.D.C. sought an injunction to prevent Vanderbilt from removing the inscription on the pediment on the front of the building, a declaratory judgment specifying Vanderbilt's rights and obligations to the Tennessee U.D.C., and compensatory damages in an amount to be shown at trial.

Vanderbilt answered and on August 1, 2003 filed a motion for summary judgment. Vanderbilt framed the primary issue before the trial court as "whether Vanderbilt should be required to maintain a name on one of its campus buildings in spite of the fact that that name evokes racial animosity from a significant, though unfortunate, period of American history." Vanderbilt then turned its attention to its legal defenses. It advanced essentially five justifications for modifying its agreement with the Tennessee U.D.C. First, Vanderbilt claimed that none of the three contracts at issue specified precisely how the name "Confederate Memorial Hall" would be placed on the building and argued that the plaque installed by the entrance in 1989 constituted substantial compliance with any naming requirement in the three contracts. Second, Vanderbilt asserted that because the dormitory had not been used to provide free or reduced-rent housing to women descendants of Confederate soldiers since approximately 1983, the statute of limitations and the doctrine of laches barred the Tennessee U.D.C.'s belated attempts to enforce their rights under the contracts.[13] Third, Vanderbilt argued that the Tennessee U.D.C. had received full consideration for

---

[13]Vanderbilt's arguments based on laches and the statute of limitations are without merit, at least with regard to the renaming of Confederate Memorial Hall. If the Tennessee U.D.C. were seeking to force Vanderbilt to honor the part of the agreement allowing women descendants of Confederate soldiers to live in the dormitory rent-free, Vanderbilt

(continued...)

its $50,000 donation because of the many women who had been allowed to live in the dormitory rent-free over the years and because the name "Confederate Memorial Hall" had remained on the building for almost seventy years. Fourth, Vanderbilt argued that principles of academic freedom prevented the court from requiring the maintenance of the name "Confederate" on the building. Fifth, Vanderbilt argued that maintaining the name "Confederate Memorial Hall" on the building might constitute a violation of state and federal anti-discrimination laws.[14]

The Tennessee U.D.C. opposed Vanderbilt's motion for summary judgment arguing (1) that the 1989 plaque did not constitute substantial compliance with Vanderbilt's contractual naming obligations, (2) that their claims were not barred by any applicable statute of limitations or the doctrine of laches, (3) that "full consideration" for their contribution of more than $50,000 would require Vanderbilt to honor all of its contractual obligations for the full life of the building, and (4) that principles of academic freedom would not prevent the trial court from forcing Vanderbilt to comply with the terms of a contract that its predecessor-in-interest, Peabody College, had entered into freely. The Tennessee U.D.C. further argued that Chancellor Gee did not have the authority to change the name of Confederate Memorial Hall and that Vanderbilt's unilateral determination that the term "Confederate" had become offensive did not constitute a legally recognized basis for allowing Vanderbilt to breach its contractual obligations. Finally, the Tennessee U.D.C. sought a partial summary judgment holding that the 1913 contract, as amended by the 1927 and 1933 agreements, constituted a valid and binding contract between the Tennessee U.D.C. and Vanderbilt and that Vanderbilt had breached its contractual obligations by unilaterally deciding to rename Confederate Memorial Hall.[15]

---

[13](...continued)
might well have a valid defense based on laches or the statute of limitations. Vanderbilt ceased complying with that portion of the agreement over twenty years ago, the Tennessee U.D.C. knew of Vanderbilt's noncompliance, and the Tennessee U.D.C. did not file suit to enforce the agreement. The agreement regarding the name of the dormitory is another matter. Vanderbilt did not publicly announce its intention to rename Confederate Memorial Hall until September 2002, and the Tennessee U.D.C. filed its lawsuit seeking to enforce the portion of the agreement pertaining to the name of the dormitory well within any applicable statute of limitations. It would be fatuous to assert that the Tennessee U.D.C.'s delay of less than two months in filing the lawsuit was "unreasonable" or that Vanderbilt was somehow prejudiced in the interval. *Dennis Joslin Co. v. Johnson*, 138 S.W.3d 197, 200 (Tenn. Ct. App. 2003) (holding that a laches defense must be premised on an unreasonable delay that has somehow prejudiced the party asserting the laches defense). Vanderbilt did not renew this particular argument in its brief on appeal or its oral argument. Accordingly, we deem it waived.

[14]Vanderbilt asserted in its summary judgment motion that it should be relieved of its obligation to name the building Confederate Memorial Hall because the name itself is "inconsistent with federal and state laws prohibiting discrimination on the basis of race." Vanderbilt, however, failed to cite any specific federal or state statute or regulation to support this argument or to provide any other legal precedent supporting its assertion that the courts may compel a private property owner to remove an inscription from an existing building or structure simply because the inscription might be a racial affront to some of the persons entering and leaving the building or to other passers by. Vanderbilt did not renew this particular argument in its brief on appeal or in its oral argument. Accordingly, we deem it to be waived.

[15]The Tennessee U.D.C. included its summary judgment motion in its written opposition to Vanderbilt's summary judgment motion. Even though the Tennessee U.D.C. should have filed a separate motion meeting all the requirements of Tenn. R. Civ. P. 56, neither Vanderbilt nor the trial court took issue with the manner in which the Tennessee U.D.C. sought a summary judgment. Accordingly, the formal deficits of the Tennessee U.D.C.'s summary judgment motion have been waived. It would serve no useful purpose to remand this case for the filing of a proper
(continued...)

-9-

The trial court heard the parties' summary judgment motions on September 22, 2003, and filed a memorandum opinion on September 30, 2003. The memorandum opinion, as well as the final order filed on October 9, 2003, granted Vanderbilt's motion for summary judgment and denied the Tennessee U.D.C.'s motion for partial summary judgment. The trial court framed the issue as "whether Vanderbilt has shown a sufficient basis for modification of the parties' contracts to allow Vanderbilt to remove the name, 'Confederate' from the building on Vanderbilt's Peabody campus." The trial court found that neither the 1913 contract nor the 1927 contract required Peabody College to name the building "Confederate Memorial Hall" and that the 1933 contract was null and void because the condition precedent of funding from the National Recovery Administration never occurred. The court nevertheless found from the parties' course of dealing that the Tennessee U.D.C. and Peabody College intended the building to be named "Confederate Memorial Hall."

The trial court then addressed whether changes in society would excuse Vanderbilt from continuing to comply with the contractual naming obligation. The court noted that in the years between the signing of the contracts and the present, racial segregation had been declared unconstitutional, racial discrimination had been outlawed, Vanderbilt had integrated its student body, and a stigma had become attached to the name "Confederate" because of the Confederacy's association with the institution of slavery. The trial court concluded that it would be "impractical and unduly burdensome for Vanderbilt to continue to perform that part of the contract pertaining to the maintenance of the name 'Confederate' on the building, and at the same time pursue its academic purpose of obtaining a racially diverse faculty and student body." The court found that Vanderbilt had "carried its burden of proof for modification of the contracts," declared that Vanderbilt sufficiently complied with its obligations under the 1913 and 1927 contracts by installation and maintenance of the plaque by the entrance to Confederate Memorial Hall, and held that, aside from the plaque, Vanderbilt could remove the name "Confederate" from the building without any further obligation to the Tennessee U.D.C. The Tennessee U.D.C. appealed.

## II.
### THE STANDARD OF REVIEW

The standards for reviewing summary judgments on appeal are well settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion–that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001).

The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Godfrey v. Ruiz*,

[15](...continued)
summary judgment motion. Our resolution of the issues raised in Vanderbilt's summary judgment motion necessarily resolves the issues raised by the Tennessee U.D.C.'s motion.

90 S.W.3d 692, 695 (Tenn. 2002); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998). To be entitled to a judgment as a matter of law, the moving party must either affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Byrd v. Hall*, 847 S.W.2d at 215 n.5; *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

Summary judgments enjoy no presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003); *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 285 (Tenn. 2001). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Godfrey v. Ruiz*, 90 S.W.3d at 695; *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

The parties have only minor disagreements regarding the facts that are relevant to the issues presented in this case. After carefully reviewing this record, we have determined that these factual disagreements are either irrelevant to the issues to be decided or that they are not material enough to prevent granting a summary judgment to either party. Thus, the central issue on this appeal is whether the trial court erred by determining that Vanderbilt, rather than the Tennessee U.D.C., was entitled to a judgment as a matter of law. If the trial court did not err, then we must affirm the judgment. If, however, the trial court erred, we must reverse the summary judgment in favor of Vanderbilt and then we must determine whether the Tennessee U.D.C. is entitled to a judgment as a matter of law based upon the undisputed facts.

### III.
### THE NATURE OF THE LEGAL RELATIONSHIP
### BETWEEN PEABODY COLLEGE AND THE TENNESSEE U.D.C.

In order to determine whether it is Vanderbilt or the Tennessee U.D.C. that is entitled to a judgment as a matter of law, we must first determine the precise nature of the legal relationship formed between the Tennessee U.D.C. and Peabody College by the 1913, 1927, and 1933 agreements. Although all three agreements use the word "contract," they do not purport to establish a typical commercial arrangement in which one party provides certain goods or services in return for a sum to be paid by the other party. Instead, the agreements indicate that the $50,000 to be raised by the Tennessee U.D.C. was to be transferred to Peabody College as a gift. Peabody College's status as a non-profit charitable organization dedicated to the advancement of education[16] suggests

---

[16]*George Peabody Coll. for Teachers v. State Bd. of Equalization*, 219 Tenn. 123, 125, 407 S.W.2d 443, 443 (1966).

the possibility of a donative intent on the part of the Tennessee U.D.C.,[17] and this possibility is confirmed by the plain language of the three agreements. The 1913 agreement repeatedly describes the $50,000 to be raised and turned over to Peabody College as a "gift" from the Tennessee U.D.C., and the 1927 and 1933 agreements do not in any way modify or retract this description.

The 1913, 1927, and 1933 contracts do not, however, describe the proposed transfer to Peabody College as a gift with no strings attached. The three contracts attach specific conditions to the gift, and the 1927 contract expressly reserves to the Tennessee U.D.C. the right to recall the gift if Peabody College fails or ceases to comply with these conditions. Where a party makes a donation to a charitable organization accompanied by conditions and a right to reclaim the donation if the conditions are not met, the law treats the arrangement between the parties as either a revocable charitable trust or a charitable gift subject to conditions. *Southwestern Presbyterian Univ. v. City of Clarksville*, 149 Tenn. 256, 281, 259 S.W. 550, 558 (1923); GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 324, at 379-80 (rev. 2d ed. 1992) [hereinafter BOGERT ON TRUSTS]; 4A SCOTT ON TRUSTS § 351, at 52-54; 15 Am. Jur. 2d *Charities* §5, at 15-16, § 8, at 18-19 (2000); 38 Am. Jur. 2d *Gifts* § 72, at 767-69 (1999); John K. Eason, *Private Motive and Perpetual Conditions in Charitable Naming Gifts: When Good Names Go Bad*, 38 U.C. Davis L. Rev. 375, 406-07 (2005) [hereinafter Eason].

The courts must look to the intent of the donating party to determine whether a particular transaction involves the creation of a revocable charitable trust or simply the giving of a charitable gift subject to conditions. 4A SCOTT ON TRUSTS § 351, at 52-53; 15 Am. Jur. 2d *Charities* § 5, at 15-16, § 8, at 18-19. A donating party will be deemed to have created a trust only if the party has expressed with certainty its intent to create a trust. Tenn. Code Ann. § 35-15-402(a)(2) (Supp. 2004)[18]; BOGERT ON TRUSTS § 45, at 483; 4A SCOTT ON TRUSTS § 351, at 49; *see, e.g.*, *Davis v. Bullington*, 164 Tenn. 272, 275, 47 S.W.2d 555, 556 (1932). Moreover, the expression of trust intent must be definite and particular, *i.e.*, the donating party must express a particular intent to confer benefits through the medium of a trust rather than through some related or similar device. *Ratto v. Nashville Trust Co.*, 178 Tenn. 457, 462, 159 S.W.2d 88, 90 (1942); BOGERT ON TRUSTS § 46, at 489-91; 15 Am. Jur. 2d *Charities* § 8, at 19. The mere expression of a donative intent, or a statement of the purpose for which a gift is given, does not constitute an expression of trust intent. BOGERT ON TRUSTS § 46, at 492, 494. Absent a finding of an intent to create a trust, the transaction will be analyzed as a gift subject to conditions. *Compare* BOGERT ON TRUSTS § 324, at 382-86 & n.15

---

[17]As the Tennessee Supreme Court long ago explained, "Charities have been peculiary [sic] favored by the courts, from the earliest period of the history of our law. Donations of this sort are usually made for the advancement of education, morality, and religion, and for the relief of the indigent, helpless, and disabled." *Dickson v. Montgomery*, 31 Tenn. 348, 362, 1851 WL 2022, at *9 (1851); *see also* 4A AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 368, at 130 (4th ed. 1989) [hereinafter SCOTT ON TRUSTS] ("Certain purposes are clearly charitable. These include the relief of poverty, the promotion of education, [and] the advancement of religion.")

[18]In 2004, the Tennessee General Assembly adopted a comprehensive code to govern trusts. Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-101 to 35-15-1103 (Supp. 2004). It applies to all trusts created before, on, or after July 1, 2004. Tenn. Code Ann. § 35-15-1103(a)(1). It applies to all judicial proceedings concerning trusts commenced on or after July 1, 2004, and to those commenced before that date unless the court finds the application of a particular provision would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties. Tenn. Code Ann. § 35-15-1103(a)(2)-(3). The Tennessee common law of trusts and principles of equity continue to supplement the Tennessee Uniform Trust Code. Tenn. Code Ann. § 35-15-106.

(listing cases where trusts found based on sufficient expression of trust intent) *with* § 324, at 382 & n.14 (listing cases where absolute or conditional gifts found because of insufficient expression of trust intent).

In many cases, the donating party is a natural person who has died by the time litigation arises concerning the appropriate characterization of the transaction. In such cases, it can be extremely difficult to discern whether the donating party possessed the intent necessary to create a revocable charitable trust or instead simply made a gift to charity subject to conditions. In this case, however, the donating party is a corporate entity that is still in existence, and its representatives have participated fully in this case. The Tennessee U.D.C. does not claim that it intended to create a revocable charitable trust when it entered into the 1913, 1927, and 1933 agreements with Peabody College, and Vanderbilt has presented no evidence suggesting a trust intent on the part of the Tennessee U.D.C. Accordingly, we have no difficulty concluding, as a matter of law, that the 1913, 1927, and 1933 contracts reflect a charitable gift subject to conditions rather than the creation of a revocable charitable trust.[19]

## IV.
### THE CONDITIONS OF THE GIFT

Donors often seek to impose conditions on gifts to charitable organizations. Richard L. Fox, *Planning for Donor Control and Other Strings Attached to Charitable Contributions*, 30 Est. Plan. 441, 441 (2003) [hereinafter Fox]. In the case of *inter vivos* transfers, the conditions are generally embodied in a gift agreement or a deed of conveyance. Tennessee Charitable Beneficiaries Act of 1997, Tenn. Code Ann. § 35-13-102(b)(8) (2001); Fox, 30 Est. Plan. at 441; *see, e.g.*, *Walker v. Shelby County Sch. Bd.*, 150 Tenn. 202, 203, 263 S.W. 792, 792 (1923); *Ledgerwood v. Gault*, 70 Tenn. 643, 645, 1879 WL 3767, at *2 (1879); *Carmody v. Trs. of Presbyterian Church*, 29 Tenn. App. 275, 276-79, 203 S.W.2d 176, 176-77 (1947). In the case of transfers to take place on the death of the donor, the conditions are generally contained in the terms of the donor's will. *See*, *e.g.*, *Hinton v. Bowen*, 190 Tenn. 463, 467-69, 230 S.W.2d 965, 967-68 (1950); *Lane v. Lane*, 22 Tenn. App. 239, 240, 120 S.W.2d 993, 994 (1938).

---

[19]The Tennessee U.D.C.'s complaint does not contain a cause of action for violation of the conditions of a conditional gift. However, there are two reasons why it does not necessarily follow that the Tennessee U.D.C. has failed to state a claim upon which relief can be granted. First, all the documents containing the conditions attached to the Tennessee U.D.C.'s gift are themselves labeled "contracts." Accordingly, we construe the Tennessee U.D.C.'s cause of action for breach of contract as sufficient to put at issue Vanderbilt's alleged breach of the conditions contained in the 1913, 1927, and 1933 agreements. Second, the Tennessee U.D.C.'s complaint also requests declaratory relief under Tenn. Code Ann. § 29-14-103 (2000) which empowers the courts to construe and declare the parties' rights and obligations under a written instrument. The declaratory judgment statutes should be construed liberally, *Cummings v. Beeler*, 189 Tenn. 151, 160, 223 S.W.2d 913, 917 (1949); *Campbell v. Sundquist*, 926 S.W.2d 250, 256 (Tenn. Ct. App. 1996), and declaratory judgments should be granted when there is a significant justiciable controversy that needs resolving. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000); *State ex rel. Earhart v. City of Bristol*, 970 S.W.2d 948, 955 (Tenn. 1998). Construing Tenn. Code Ann. § 29-14-103 liberally, we conclude that it is broad enough to include lawsuits to construe written gift agreements, to determine the validity and application of the conditions in these agreements, and to ascertain the parties' rights and obligations under these agreements. This case unquestionably involves a significant justiciable controversy that needs resolving. Both the Tennessee U.D.C. and Vanderbilt are entitled to an authoritative judicial determination of their rights and obligations under the 1913, 1927, and 1933 agreements.

A conditional gift is enforceable according to the terms of the document or documents that created the gift. Tenn. Code Ann. § 35-13-103 (2001); 38 Am. Jur. 2d *Gifts* § 72, at 767-69; 14 C.J.S. *Charities* § 30, at 199-200 (1991). If the recipient fails or ceases to comply with the conditions, the donor's remedy is limited to recovery of the gift. *Southwestern Presbyterian Univ. v. City of Clarksville*, 149 Tenn. at 269, 259 S.W. at 554 ("One may attach such conditions to his contributions as to support his right to withdrawal thereof, upon a violation of such conditions, but his rights, or those of a group so situated, must be so limited."); Eason, 38 U.C. Davis L. Rev. at 406-07 & nn.115 & 118, 421; *see also Ver Brycke v. Ver Brycke*, 843 A.2d 758, 771 (Md. 2004) (collecting cases); *Stock v. Augsburg Coll.*, No. C1-01-1673, 2002 WL 555944, at *5 (Minn. Ct. App. Apr. 16, 2002); *Zirngibl v. Zirngibl*, 477 N.W.2d 637, 640 (Wis. Ct. App. 1991); 38 Am. Jur. 2d *Gifts* § 72, at 767-69; 14 C.J.S. *Charities* § 30, at 200. Because noncompliance results in a forfeiture of the gift, the conditions must be created by express terms or by clear implication and are construed strictly. *Southwestern Presbyterian Univ. v. City of Clarksville*, 149 Tenn. at 282, 259 S.W. at 558; *Hooton v. Nacarato GMC Truck, Inc.*, 772 S.W.2d 41, 46 (Tenn. Ct. App. 1989); *Simmons v. Hitt*, 546 S.W.2d 587, 591 (Tenn. Ct. App. 1976).

In order to identify the conditions attached to the gift from the Tennessee U.D.C. to Peabody College, we must first determine which contract or contracts govern the gift. Vanderbilt argues that the 1933 contract cannot be considered because it is void by its own terms. The 1933 contract is expressly conditioned on Peabody College's receipt of funding from the National Recovery Administration, and it states that in the event such funding is not received, "this contract shall be void and of no effect." It is undisputed that Peabody College did not receive the requested funding from the National Recovery Administration, and according to Vanderbilt, the failure of this condition precedent absolved Peabody College, and hence Vanderbilt, from any duty to comply with the conditions of the gift contained in the 1933 contract.

It is true that parties to a contract are generally free to impose whatever conditions they wish on their contractual undertakings, and that if such conditions are not literally met or exactly fulfilled, no liability can arise on the promise qualified by the conditions. 13 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS §§ 38:2, at 370-71, 38:6, at 384-85 (4th ed. 2000) [hereinafter WILLISTON ON CONTRACTS]. However, it is also "well established that a party to a contract may waive a condition precedent to his or her own performance of a contractual duty, even in the absence of a provision in the contract expressly authorizing a waiver." 13 WILLISTON ON CONTRACTS § 39:17, at 568-69; *see American Cent. Ins. Co. v. McCrea, Maury & Co.*, 76 Tenn. 513, 525, 1881 WL 4452, at *6 (1881) ("it is in the nature of a condition precedent to be subject to waiver"). This is so even where, as here, the contract contains a clause stating that the entire agreement will be null and void if the condition is not met. 13 WILLISTON ON CONTRACTS § 39:17, at 568-69. If, in spite the failure of the condition precedent, the party in whose favor it was drafted performs or receives performance under the contract, the condition precedent is waived. 13 WILLISTON ON CONTRACTS § 39:17, at 569; 8 CATHERINE M. A. MCCAULIFF, CORBIN ON CONTRACTS § 40.4, at 533 (Joseph M. Perillo ed., rev. ed. 1999) [hereinafter CORBIN ON CONTRACTS]. The contract will be enforced despite the nonoccurrence of the condition, and the party that waived the condition is estopped from asserting the failure of the condition as a defense in a suit to enforce the agreement. 13 WILLISTON ON CONTRACTS § 39:17, at 569-70.

Perhaps recognizing this flaw in its argument, Vanderbilt argued to the trial court, and the trial court agreed, that Peabody College performed solely under the terms of the 1927 agreement. This claim cannot be squared with the undisputed evidence in the record. The 1933 contract required Peabody College to construct a much larger and more expensive building than the 1927 agreement did, contemplated that the building would be located on the quadrangle rather than at a less prominent location on the campus, and obligated Peabody College to place an inscription on the building naming it "Confederate Memorial." The undisputed evidence in the record shows that Peabody College complied with each of these provisions of the 1933 contract. Thus, Peabody College waived the condition precedent of funding from the National Recovery Administration, and Vanderbilt, as Peabody College's successor-in-interest, cannot rely on the failure of the condition precedent as a defense to the enforceability of the 1933 contract.

Throughout its brief on appeal, Vanderbilt also suggests, though it does not claim outright, that the 1933 contract is unenforceable because it was never signed by Peabody College. However, a written contract does not necessarily have to be signed in order to be binding on the parties. *Noe v. Hodges*, 22 Tenn. 162, 166, 1842 WL 1905, at *3 (1842); *Southeast Drilling & Blasting Servs., Inc. v. Hu-Mac Contractors, LLC*, No. M2001-00635-COA-R3-CV, 2003 WL 22055964, at *3 (Tenn. Ct. App. Sept. 4, 2003) (Tenn. R. App. P. 11 app. voluntarily dismissed); *T. R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002). The critical factor is whether there was mutual assent to be bound by the contract. *T. R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d at 866.

Vanderbilt has produced no evidence affirmatively demonstrating that Peabody College did not sign the 1933 contract. Instead, Vanderbilt relies solely on a lack of evidence, *i.e.*, the inability of the parties to locate a fully executed copy of the 1933 contract after the passage of seventy or more years. However, in determining whether a contract exists, courts can consider relevant evidence such as whether the parties performed under its terms. *T. R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d at 866. Even in cases where the evidence affirmatively shows that one party did not sign a written agreement, that party will be estopped from denying the validity of the contract where it has manifested assent to it by performing under its terms. *T. R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d at 866; *R. J. Betterton Mgmt. Servs., Inc. v. Whittemore*, 769 S.W.2d 214, 216 (Tenn. Ct. App. 1988). This rule applies with even greater force where, as here, the party seeking to contest the validity of the contract has produced no evidence tending to show that the contract was not actually signed. Accordingly, Vanderbilt is estopped from denying the validity of the 1933 contract.

Taking all three contracts together, the gift from the Tennessee U.D.C. to Peabody College was subject to three specific conditions. First, Peabody College was required to use the gift to construct a dormitory on its campus conforming to plans and specifications approved by the Tennessee U.D.C. Second, Peabody College was required to allow women descendants of Confederate soldiers nominated by the Tennessee U.D.C. and accepted by Peabody College to live on the first and second floors of the dormitory without paying rent and paying all other dormitory expenses on an estimated cost basis. Third, Peabody College was required to place on the dormitory an inscription naming it "Confederate Memorial." The contracts do not specify the duration of these conditions. In such circumstances, the court must determine whether a duration can be inferred from the nature and circumstances of the transaction. *Birkholz v. Hardy*, No. W2003-01539-COA-R3-CV,

2004 WL 1801736, at \*5-8 (Tenn. Ct. App. Aug. 11, 2004) (No Tenn. R. App. P. 11 application filed); *Johnson v. Welch*, No. M2002-00790-COA-R3-CV, 2004 WL 239756, at \*11-15 (Tenn. Ct. App. Feb. 9, 2004) (No Tenn. R. App. P. 11 application filed); 1 WILLISTON ON CONTRACTS § 4:19, at 429, 434-37, 441. Given the nature of the project and the content of the conditions, we conclude that these conditions were not meant to bind Peabody College forever but instead were to be limited to the life of the building itself. Thus, as long as the building stands, these three conditions apply to the gift.

## V.
### VANDERBILT'S COMPLIANCE WITH THE CONDITIONS

In its complaint, the Tennessee U.D.C. claimed that Vanderbilt had already violated the condition requiring an inscription on the building naming it "Confederate Memorial" by publicly and privately announcing its intention to rename the building "Memorial Hall" and that Vanderbilt planned to violate the condition further by removing or altering the inscription on the pediment. In its answer, Vanderbilt admitted its plans to rename the building "Memorial Hall" and to remove the word "Confederate" from the inscription on the pediment but denied that these actions would violate the conditions of the gift as reflected in the agreements between the parties. In its summary judgment papers and its brief on appeal, Vanderbilt argues that the Tennessee U.D.C. cannot succeed on its claim against Vanderbilt as a matter of law because the undisputed evidence in the record shows that Vanderbilt and Peabody College substantially performed their obligations under the contracts, that the Tennessee U.D.C. has already received full consideration for its original contribution, and that principles of academic freedom require that Vanderbilt be allowed to change the name of Confederate Memorial Hall without any further obligation to the Tennessee U.D.C. We find no merit in these arguments.

Vanderbilt's claim that the placement of a plaque by the entrance to the building describing the contributions of the Tennessee U.D.C. to the original construction constitutes substantial performance with the inscription condition cannot be taken seriously. The determination of whether a party has substantially performed depends on what it was the parties bargained for in their agreement. *SDS & Assocs., Inc. v. Bldg. Plastics, Inc.*, No. W2002-01532-COA-R3-CV, 2003 WL 21998348, at \*11-12 (Tenn. Ct. App. Aug. 22, 2003) (No Tenn. R. App. P. 11 application filed). Here, the 1933 contract expressly and unambiguously required Peabody College to place an inscription on the building naming it "Confederate Memorial," and we have already concluded that the parties intended the inscription to remain until the building was torn down. Peabody College complied with the condition by placing a large inscription in stone on the pediment of the building reading "Confederate Memorial Hall." Peabody College did so in conformity with Peabody College's own 1934 construction drawings which show these words in large incised lettering on the pediment of the building.

Vanderbilt continued to comply fully with this condition from its 1979 merger with Peabody College until 2002 when it announced its plans to remove the word "Confederate" from the building's pediment. It is doubtful that a party such as Vanderbilt that has wilfully changed course after over twenty years of compliance with the literal terms of an agreement could ever rely on the doctrine of substantial performance. *Interstate Bldg. Corp. v. Hillis*, 17 Tenn. App. 171, 174, 66 S.W.2d 597, 598 (1933); *Smith v. Smith*, 112 S.W.3d 275, 279 (Tex. Ct. App. 2003). Even if it

-16-

could, no reasonable fact-finder could conclude that replacing a name written in stone in large letters on the pediment of a building with a plaque by the entrance constitutes substantial performance of a requirement to do the former.

Vanderbilt's argument that it should be excused from complying with the inscription condition contained in the 1933 contract because the Tennessee U.D.C. has already received enough value for its original contribution to the construction of the building is likewise without merit. The courts must interpret contracts as they are written, *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999), and will not make a new contract for parties who have spoken for themselves. *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955); *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). The courts do not concern themselves with the wisdom or folly of a contract, *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960); *Brooks v. Networks of Chattanooga, Inc.*, 946 S.W.2d 321 324 (Tenn. Ct. App. 1996), and are not at liberty to relieve parties from contractual obligations simply because these obligations later prove to be burdensome or unwise. *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991); *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983); *Carrington v. W. A. Soefker & Son, Inc.*, 624 S.W.2d 894, 897 (Tenn. Ct. App. 1981).

The same is true of conditions contained in a gift agreement. By entering into the 1913, 1927, and 1933 contracts, Peabody College necessarily agreed that the value of the gift it was receiving was worth the value of full performance of the conditions of the gift. 8 CORBIN ON CONTRACTS § 36.2, at 338. In short, Vanderbilt's unilateral assessment that Peabody College gave away too much in the 1913, 1927, and 1933 agreements does not constitute a legal defense that would excuse Vanderbilt from complying with the conditions of the original gift.

Vanderbilt's assertion that principles of academic freedom allow it to keep the gift from the Tennessee U.D.C. while ignoring the conditions attached to that gift is equally unavailing. As Vanderbilt correctly notes in its brief on appeal, the United States Supreme Court has long been solicitous of the independence of private colleges from government control. *See, e.g.*, *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518 (1819). However, the source of the obligation at issue in this case is not the government but Vanderbilt itself. The original obligation to place the inscription on Confederate Memorial Hall is contained in a private gift agreement voluntarily entered into between Peabody College and the Tennessee U.D.C. Vanderbilt's legal obligation to comply with the conditions of that gift agreement arises not from any action on the part of the government but from Vanderbilt's own decision to enter into a merger agreement with Peabody College in 1979 in which it agreed to succeed to Peabody College's legal obligations.

Moreover, we fail to see how the adoption of a rule allowing universities to avoid their contractual and other voluntarily assumed legal obligations whenever, in the university's opinion, those obligations have begun to impede their academic mission would advance principles of academic freedom. To the contrary, allowing Vanderbilt and other academic institutions to jettison their contractual and other legal obligations so casually would seriously impair their ability to raise money in the future by entering into gift agreements such as the ones at issue here.

As noted above, where a donee fails or ceases to comply with the conditions of a gift, the donor's remedy is limited to recovery of the gift. However, it would be inequitable to allow Vanderbilt to "return" the gift at issue here simply by paying the Tennessee U.D.C. the same sum of money the Tennessee U.D.C. donated in 1933 because the value of a dollar today is very different from the value of a dollar in 1933. To reflect the change in the buying power of the dollar, the amount Vanderbilt must pay to the Tennessee U.D.C. in order to return the gift should be based on the consumer price index published by the Bureau of Labor Statistics of the United States Department of Labor. As attested by numerous Tennessee statutes, reference to the consumer price index is the most common way to calculate a change in the value of money over time under Tennessee law. *See, e.g.*, Tenn. Code Ann. §§ 6-54-803(b) (1998), 8-23-101(d)(3) (2002), 8-23-103(2) (2002), 16-15-5003(f)(1) (Supp. 2004), 46-2-302(c) (2000), 70-1-206(a)(7) (2004). In addition, the Tennessee Supreme Court has endorsed the consumer price index as an accurate measure of the change in the purchasing power of a dollar. *Overton County v. State ex rel. Hale*, 588 S.W.2d 282, 289 (Tenn. 1979) ("The theory behind hinging an annual change in salary to the consumer price index is that the index accurately measures the change in the purchasing price of the dollar, with the result that by 'indexing' judicial salaries, the 'compensation' remains constant. That theory has a solid foundation in fact."). Thus, on remand, if Vanderbilt continues to elect not to comply with the terms of the gift, it must pay the Tennessee U.D.C. in today's dollars the value of the original gift in 1933.

In settling on this method of accounting for the changed value of the Tennessee U.D.C.'s original contribution, we have considered and rejected an approach that would require Vanderbilt to pay simple or compound interest on the original contribution.[20] Any requirement that Vanderbilt pay interest on the original donation would necessarily be premised on the idea that the Tennessee U.D.C. was deprived of all beneficial use of the funds from the time of the original donation to the present. Such an approach would invite an offset defense by Vanderbilt and would require the trial court to attempt to quantify the value to the Tennessee U.D.C. not only of the housing awards, but also of having the inscription on the pediment of the building for the past seventy years. Determining the value of an inscription is not a matter that is subject to easy proof or to reasonably definite calculation, and any attempt to do so would lead to a calculation of damages that was impermissibly speculative in nature. *Waggoner Motors, Inc. v. Waverly Church of Christ*, ___ S.W.3d ___, ___, 2004 WL 2083712, at *10 (Tenn. Ct. App. 2004); *Shahan v. Franklin County*, No. M2002-00725-COA-R3-CV, 2003 WL 23093836, at *9 (Tenn. Ct. App. Dec. 30, 2003) (No Tenn. R. App. P. 11 application filed); *cf. Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, Nos. 249438 & 249471, 2005 WL 326876, at *7 (Mich. Ct. App. Feb. 10, 2005) (noting that trial court stated that plaintiff had cited no authority with respect to the value of the loss of naming rights by a family charitable foundation, found that there was no method to measure damages, and therefore concluded that plaintiff's damages were too speculative).

---

[20]The 1927 contract obligated Peabody College to pay interest on the contribution in the event the Tennessee U.D.C. exercised its power to recall the funds, but in context, it is clear that this interest provision was meant to apply only if the funds were recalled before they were used to construct the building.

## VII.

This court is well aware of the strong passions this case has generated on both sides. The depth of feeling is understandable given that the case touches on issues of heritage, identity, and racial justice. According to Vanderbilt, the maintenance of the inscription on the pediment of Confederate Memorial Hall forces Vanderbilt to send a message of racial hatred and exclusion that it no longer wishes to send. According to the Tennessee U.D.C., the inscription is not a symbol of racial intolerance and oppression, and Vanderbilt's decision to remove it is nothing less than an attempt to rewrite history in a manner that demeans its members' ancestors. It is not within the purview of this court to resolve the larger cultural and social conflicts regarding whether and how those who fought for the Confederacy should be honored or remembered. What this court has done is to resolve the existing legal dispute between the parties according to neutral principles of law. Our decision should not be viewed as an endorsement of either Vanderbilt's decision to change the name or the Tennessee U.D.C.'s desire to perpetuate it.

In summary, we have determined that the undisputed facts establish that the Tennessee U.D.C. gave a monetary gift to Vanderbilt's predecessor-in-interest subject to conditions and that Vanderbilt's predecessor-in-interest accepted the gift as well as the conditions that accompanied it. It is further undisputed that Vanderbilt now declines to abide by the conditions attached to the gift. Thus, because Vanderbilt has presented no legal basis for permitting it to keep the gift while refusing to honor the conditions attached to it, Vanderbilt must now either return the present value of the gift to the Tennessee U.D.C. or reverse its present course and agree to abide by the conditions originally placed on the gift.

Accordingly, we reverse the summary judgment entered in favor of Vanderbilt not because the record reveals disputed issues of material fact but rather because Vanderbilt has failed to demonstrate that it is entitled to a judgment as a matter of law. We have also determined that, if Vanderbilt insists on changing the name of Confederate Memorial Hall, the Tennessee U.D.C. has demonstrated that it is entitled to a judgment as a matter of law on its motion for partial summary judgment. We remand the case with directions to calculate the present value of the Tennessee U.D.C.'s gift to Peabody College, to enter a judgment in favor of the Tennessee U.D.C. in that amount, and to make whatever further orders may be required. The costs of this appeal are taxed to Vanderbilt University for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.